IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

In re CREE, INC.           )      MASTER FILE NO. 1:03CV00549
SECURITIES LITIGATION      )      CLASS ACTION

MEMORANDUM OPINION

BULLOCK, District Judge

Plaintiffs bring this consolidated class action against
Defendant corporation Cree, Inc. ("Cree") and several Cree
officers and directors, F. Neal Hunter, Cynthia B. Merrell,
John W. Palmour, Charles Swoboda, Calvin H. Carter, James E.
Dykes, Dolph W. von Arx, and Walter L. Robb (together
"Defendants"), alleging that Defendants engaged in fraudulent
business transactions designed to artificially inflate Cree's
stock price.  Plaintiffs bring securities fraud claims under
Sections 10(b), 18, 20(a), and 20(A) of the Securities Exchange
Act of 1934, 15 U.S.C. §§ 78j(b), 78r, 78t(a), and 78t-1(a);
Rule 10b-5 promulgated under Section 10 of the Exchange Act, 17
C.F.R. § 240.10b-5; and Section 304 of the Sarbanes-Oxley Act of
2002, 15 U.S.C. § 7243. Before the court is Defendants' motion
to dismiss the first amended complaint under Federal Rules of
Civil Procedure 9 and 12(b)(6) as well as the Private Securities
Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4 et
seq.  For the reasons set forth below, Defendants' motion will be
granted as to all claims.

FACTS

Cree, a North Carolina corporation headquartered in Durham, North Carolina, manufactures silicon carbide-based products, including semiconductors, transistors, and light-emitting diodes, and performs research and development ("R&D") related to such products for the government, private customers, and on its own behalf. On June 12, 2003, Eric Hunter, a co-founder and former CEO of Cree, and his wife filed suit against the Company and F. Neal Hunter, his brother and a co-founder of Cree, alleging violations of state and federal securities laws and the whistle-blower provisions of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, defamation, and intentional infliction of emotional distress.[1] Five days later the Hunters filed a motion for a preliminary injunction against the Company and F. Neal Hunter seeking to prohibit Defendants' alleged harassment of them. Hunter v. Cree, Inc., et al., 1:03CV540 (M.D.N.C.).

Soon after an August 14, 2003, hearing in which this court denied the request for an injunction, Eric Hunter and his wife voluntarily dismissed their securities fraud claims with

---

[1]Eric Hunter served as Cree's President and CEO from 1987 to 1994 and was Chairman of Cree's Board of Directors until 1995. When Eric Hunter filed his complaint against Cree, he was a Senior Technology Advisor at Cree, earning an annual salary of $15,000 as well as stock options, which he categorized as warrants because he performed no work for Cree.

prejudice and settled the remainder of the lawsuit.[2]  Upon

announcement of the suit, however, Cree's stock price dropped

18.5%.  Within four days of the announcement and resultant loss

in market value, the first of nineteen securities fraud class

action lawsuits was filed against Cree.  The cases were

consolidated on November 25, 2003, and the Louisiana Teachers'

Retirement System was named lead plaintiff.  The class has not

been certified.

Plaintiffs filed a Consolidated Class Action Complaint on

January 16, 2004.  The complaint was dismissed on August 27,

2004, for failure to meet the heightened pleading requirements of

the PSLRA.  In re Cree, Inc., Sec. Litig., 333 F. Supp. 2d 461

(M.D.N.C. 2004).  Specifically, the court found that Plaintiffs

failed to plead adequately any falsity with regard to statements

or omissions related to certain transactions because they failed

---

[2]At the August 14, 2003, hearing on the motion for a
preliminary injunction, Eric Hunter testified at length about
alleged threats and harassment by family members and others
toward him and his family.  Much of his testimony can be
described as unusual.  He described telephone threats, break-ins,
and being followed and photographed in restaurants and hotels in
Europe and in this country, all of which he attributed to
Defendants.  He related physical confrontations with his
brothers, including a snowball fight, and a recent assault by his
wife's uncle in Ohio, all of which allegedly related to Cree.  He
also related threats by his brothers and mother designed to get
him to seek psychiatric care, and many other unusual events,
including a cousin's alleged threat against Vice President Al
Gore.
    Finding no merit to Eric Hunter's allegations of immediate,
irreparable harm to him, the court at the conclusion of the
hearing denied the request for a preliminary injunction.

to plead with particularity fraud in the underlying transactions. Plaintiffs also failed to plead facts giving rise to a strong inference that any of the Defendants acted with intent or recklessness in making statements or omitting material facts from statements related to the allegedly fraudulent transactions.

With leave to amend their consolidated complaint, Plaintiffs filed their First Amended Complaint ("FAC") on October 26, 2004. Plaintiffs claim that Defendants violated federal securities laws when they issued dozens of materially false and misleading public statements between August 12, 1999, and June 13, 2003, the putative class period, when such statements failed to reveal the "true," i.e., fraudulent, nature of a series of corporate transactions. First, Plaintiffs contend that Cree engaged in fraudulent round-trip transactions with its own funds with other corporations--Microvision, World Theater, Inc. (WTI),[3] Xemod, Lighthouse, and Spectrian--in which Cree improved its financial performance by purchasing its own revenue. In the first four cases, Plaintiffs argue that Cree overpaid for equity investments in Microvision, WTI, Xemod, and Lighthouse and that the overpayments were returned to Cree in the guise of payments for R&D that Cree never performed. Similarly, Plaintiffs contend that Cree intentionally overpaid for its $100 million acquisition

---

[3]Eric Hunter was a founder of WTI. At about the same time he filed his complaint against Cree he also sued WTI.

of UltraRF, a division of the Spectrian Corporation, and that Cree recouped the overpayment through fraudulent R&D and product sales to Spectrian. Next, Plaintiffs allege that Cree's sales of silicon carbide crystals to C&C,[4] a company founded by Eric Hunter and his brother Jeff Hunter, were made pursuant to a fraudulent channel stuffing arrangement under which C&C accepted shipments of Cree's crystals far in excess of its needs to boost Cree's sales revenue. Finally, Plaintiffs allege that Cree's public statements violated Generally Accepted Accounting Principles ("GAAP") when Cree failed to account properly for the round-trip nature of payments received from each of the companies in which it invested and when Cree booked as sold goods shipped to C&C that were subject to C&C's right of return.

---

[4]Eric Hunter also sued C&C and Jeff Hunter in June 2003. The suit was dismissed pursuant to a stipulation of dismissal with prejudice before a responsive pleading was filed. Nevertheless, Eric Hunter's amended complaint against C&C provides some insight into his lawsuits against the various companies with which he was involved, including Cree. Eric Hunter held a 10% or greater interest in C&C, and was, therefore, an "affiliate" under the relevant securities laws. As such, he was limited in his ability to sell his C&C shares. He claims to have reduced his holdings below 10% in November 1997, and to have requested designation as a non-affiliate from C&C's lawyers in January 1998. That designation was not granted until mid-February 1998, a delay caused, according to Eric Hunter, by a conspiracy between C&C and Cree to enable Cree and Cree insiders to sell their C&C shares before Eric Hunter's flooded the market. By the time Eric Hunter was deemed a non-affiliate, C&C's share price had dropped from $17 to $11 in the wake of reported inventory problems.

Defendants, in their motion to dismiss, deny that the transactions were fraudulent and argue that Plaintiffs have failed to establish a _prima facie_ case of securities fraud.

DISCUSSION

I.   Plaintiffs' § 10(b) and Rule 10(b)-5 Claims

It is a violation of Section 10(b) of the Exchange Act for any person to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated under Section 10(b), further provides that:

> It shall be unlawful for any person . . . [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a claim of fraud under Section 10(b) and Rule 10b-5, a plaintiff must demonstrate that "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages."  Phillips v. LCI Int'l, Inc., 190 F.3d 609, 613 (4th Cir. 1999).

6

A.  Pleading Fraud with Particularity

Plaintiffs' claims of fraud must meet the pleading requirements of both Rule 9 of the Federal Rules of Civil Procedure and the PSLRA.  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P. 9(b).  "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'"  Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure Civil § 1297 at 590 (2d ed. 1990)).  "Despite the generally rigid requirement that fraud be pleaded with particularity, allegations may be based on information and belief when facts are peculiarly within the opposing party's knowledge," Wexner v. First Manhattan Co., 902 F.2d 169, 172 (2d Cir. 1990), but "[w]here pleading is permitted on information and belief, a complaint must adduce specific facts supporting a strong inference of fraud or it will not satisfy even a relaxed pleading standard."  Id.

The PSLRA, which applies specifically to private securities fraud class actions, 15 U.S.C. § 78u-4(a)(1), echoes the

7

requirements of Rule 9(b) and codifies the requirement that "if

an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with

particularity all facts on which that belief is formed."  15

U.S.C. § 78u-4(b)(1).[5]

> To determine

> whether the factual allegations support a reasonable
> belief that fraud occurred, courts should evaluate the
> facts alleged as a whole, evaluating the level of
> detail, number, and coherence and plausibility of the
> allegations . . . whether the sources of the facts are
> disclosed and the reliability of those sources; and any
> other factors.

Adams v. Kinder-Morgan, Inc., 340 F.3d 1083, 1102-03 (10th Cir.

2003).  Where, as here, a plaintiff relies on confidential

sources, "the facts alleged in an information and belief

complaint will usually have to be particularly detailed,

numerous, plausible, or objectively verifiable by the defendant

before they will support a reasonable belief that the defendant's

statements were false or misleading."  Id. at 1103.  The facts

---

> [5]Although the words 'facts' and 'particularity' are not
> defined in the statute, their meaning is plain . . . .
> A 'fact' is an 'event or circumstance' or 'a truth
> known by actual experience or observation.'
> 'Particularity' refers to 'the quality or state of
> being particular,' i.e., 'dealing with or giving
> details; detailed; minute; circumstantial.'  A
> complaint that fails to comply with these requirements
> must be dismissed on defendant's motion.

In re Cable & Wireless, PLC, 321 F. Supp. 2d 749, 761 (E.D. Va.
2004) (internal citations to dictionaries omitted).

alleged must also raise the probability that a person in the source's position would possess the information supplied. See ABC Arbitrage v. Tchuruk, 291 F.3d 336, 352 (5th Cir. 2002). To evaluate whether a confidential source is relaying first-hand knowledge or merely speculating, the court examines "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." In re Cabletron Sys., Inc., 311 F.3d 11, 29-30 (1st Cir. 2002). Despite these heightened pleading requirements, Plaintiffs are not required to plead "detailed evidentiary matter" or "set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants." Keeney v. Larkin, 306 F. Supp. 2d 522, 528 (D. Md. 2003).

Plaintiffs adequately identify the statements[6] they believe to be false and the reasons why they believe them to be false, but fail to state with particularity facts supporting a strong inference of fraud.

---

[6]The allegedly false statements are found in Cree's 10-Ks from 1999 to 2002, 10-Qs for each quarter from 2000-2003, the 1999, 2000, and 2001 proxy statements, the December 1999 and January 2000 registrations, the January 2000 prospectus, and various Cree press releases, conference calls, and other public statements made during the class period.

### i. <u>WTI, Xemod, and Lighthouse</u>

Cree purchased equity stakes in WTI, Xemod, and Lighthouse during the class period, and in each case was forced to write down losses associated with the investments. Plaintiffs contend that the investments were fraudulent, arguing that Cree intentionally overpaid for its holdings in each company so that its partner in the transaction could return the excess cash to Cree as payment for "bogus" R&D projects. Through these round-trip transactions, Cree created the appearance of increasing sales and revenue while decreasing its own R&D expenses, all in an effort to satisfy analysts and investors and prop up the price of Cree stock.

While Plaintiffs paint a troubling picture of Cree's business practices, they fail to offer any evidence of fraud in either leg of the alleged round-trip transactions. Plaintiffs merely propound, with no supporting evidence, the bald assertion that Cree overpaid for its equity stake in each company, and state, without identifying a single source, document, or basis in fact, that Cree failed to perform R&D services for WTI, Xemod, or Lighthouse. Indeed, the sole basis for Plaintiffs' allegations of fraud is that Cree failed to disclose the investments and subsequent write-offs at the earliest appropriate time. Assuming, without deciding, that Plaintiffs are correct in their assertion that Cree violated GAAP in failing to report the

10

transactions at the appropriate time, such failure is not a fact from which the court can draw a strong inference that Cree engaged in fraudulent round-trip transactions with WTI, Xemod, or Lighthouse.[7]  A failure to report the transactions in a timely manner is not indicative of an overpayment in the investment or of a failure to perform the R&D services for which Cree was paid. Plaintiffs' claims alleging fraud in the underlying transactions with WTI, Xemod, and Lighthouse must, therefore, be dismissed.

    ii.  <u>Microvision</u>

    Cree made two separate equity investments in Microvision, and Microvision, at or near the time of those investments, agreed to purchase R&D services from Cree.  Plaintiffs allege that these simultaneous transactions were two legs of a single, round-trip transaction in which Cree intentionally overpaid for its Microvision shares and Microvision funneled the cash back to Cree through payments for R&D that Cree never performed.  The deal, according to Plaintiffs, allowed Cree to artificially increase revenue and reduce R&D expenses, thereby inflating its stock price.

---

[7]Cree contends it did include the write-offs as to these three companies in their total write-offs related to investments throughout the class period, although it did not identify the companies by name.

Case 1:03-cv-00549  Document 87  Filed 08/02/05  Page 11 of 41

As in the cases of WTI, Xemod, and Lighthouse, Plaintiffs must, because of the round-trip nature of the fraud alleged, demonstrate fraud in both legs of the transaction. That is, they must plead with particularity facts showing an intentional overpayment by Cree for its equity stake in Microvision, and must further demonstrate that the R&D payments by Microvision were for work that was not performed, and, indeed, was never intended to be performed by either party. The complaint is lacking in both respects.

As noted, Cree made two separate investments in Microvision. Plaintiffs, rather incongruously, allege both were part of the same fraudulent scheme, but allege overpayment only in relation to the second investment in which Cree purchased 250,000 shares for $50 per share on April 13, 2000.[8] The $50 purchase price in the second transaction was higher than the then-current market price of $36.88.[9] This is the sole fact on which Plaintiffs

───────────────

[8] An allegation of overpayment in the first investment would be specious. In May 1999 Cree paid $4.5 million for 268,600 Microvision shares, or $16.75 per share. In June 2000, Cree sold 162,600 of those shares for $6.3 million, or $38.75 per share, thereby realizing a gain of $3.6 million while retaining the remaining 102,000 shares which had, at that time, a market value of $3,952,500.

[9] Cree explains in its brief in support of its motion to dismiss that the General Electric Pension Trust purchased a stake in Microvision at the same time and for the same price and that, in any event, the price was set on the closing date using an agreed upon formula based on the midpoint between the then-current price and the price on the day the deal was agreed

(continued...)

12

support their conclusion that Cree fraudulently overpaid for its Microvision shares.

As for the second leg of the alleged round-trip transaction, Plaintiffs rely on two former Microvision employees who state that Cree did not perform any R&D. First, Plaintiffs offer the purported testimony of a former Microvision project manager who stated that he was personally familiar with the terms of the R&D contract. He said that the contract included no development milestones, required Cree to perform no R&D beyond that which it was already doing, and related to products useless to Microvision. In response, Cree produced the contract.[10] It includes specific development milestones that were to be met within defined time periods, and specifies work to be performed

---

[9](...continued)
upon. This is supported by Microvision's Registration Statement filed with the SEC on Form S-3 on March 30, 2000.

[10]Because Plaintiffs specifically referred to the contract in their complaint to support their allegations of fraud, the court can examine its terms. Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999). See In re USEC Secs. Litig., 190 F. Supp. 2d 808, 815 (D. Md. 2002) (noting in securities fraud class action that "the Court will consider the facts stated in the complaint, as well as the documents referred to in the complaint and relied upon by plaintiff in bringing the action"); In re First Union Corp. Sec. Litig., 128 F. Supp. 2d 871, 883 (W.D.N.C. 2001) ("In securities fraud actions, courts will also examine the other information that was publicly available to reasonable investors at the time the defendant made statements plaintiffs alleged were fraudulent, including documents or articles cited in the complaint, SEC filings, press releases, stock price tables, and other material on which plaintiffs' allegations necessarily rely." (internal quotations omitted)).

13

on blue and green laser diodes, the very products the project manager claimed were not covered under the agreement. The court must consider the reliability of Plaintiffs' sources; the discrepancies between what the project manager purported to know about the contract and the terms of the contract undermine this source and render the representation unreliable.

The next source, Microvision's former director of R&D, stated that Cree never performed R&D for Microvision and that it was "obvious" Microvision would never "see anything out of" its relationship with Cree. This source based such conclusions on the fact that although he was typically involved in all Microvision R&D projects, both internal and external, he was never told what the Cree R&D project was for, was not shown what activity had taken place, and his team was denied access to Cree's facilities.

In the court's August 27, 2004, opinion, the testimony of this witness was deemed sufficient to support a claim of fraud, based on the witness's job title and description and on the information he provided, as corroborated by the now-discredited project manager. The testimony now lacks corroboration, and the witness's job title, described as vice president of R&D in the initial consolidated complaint, is now described as director of R&D. The lower rank of the source suggests a decrease in the authority or reliability of his testimony, as a director could

14

much more likely be legitimately excluded from a given R&D project than could a vice president.  Most importantly, regardless of his title or lack of corroborating testimony, the former director of R&D offers no facts to enable the court to infer that Cree failed to perform the R&D for which Microvision paid, only his own speculation as to why he was excluded from the R&D project.  Such speculation does not satisfy the PSLRA's requirement that pleadings of fraud be supported by particularized facts ("a truth known by actual experience or observation").  Thus, this source does not provide the first hand knowledge required to support Plaintiffs' assertions of fraud. See, e.g., In re Cabletron Sys., Inc., 311 F.3d at 29-30.

Finally, the complaint retains references to statements made by Eric Hunter alleging fraud in the Microvision transactions. This court deemed reliance on Eric Hunter insufficient in its August 27, 2004, opinion because Plaintiffs failed to provide any basis for his knowledge other than his status as a former CEO of Cree and brother of the then-current CEO.  Such status, the court ruled, is insufficient to substantiate Eric Hunter's claims because it does not, in itself, establish his firsthand participation in any of the allegedly fraudulent transactions. The court instructed Plaintiffs to cure this defect by pleading a factual basis for Eric Hunter's claims that demonstrates his first-hand knowledge rather than mere speculation.  Plaintiffs

15

seek to meet their burden by asserting that Eric Hunter was employed by Cree as a consultant throughout the class period. Unfortunately for Plaintiffs, they also claim, repeatedly, that Cree issued false and misleading statements when, in various SEC filings, the Company touted its consulting relationship with Eric Hunter. Such statements were false, Plaintiffs argue, because at no time during his tenure as a consultant to Cree was Eric Hunter permitted to actually consult the Company or perform work of any kind. Eric Hunter confirmed this fact in his testimony at the preliminary injunction hearing.[11] Needless to say, Plaintiffs have failed to establish Eric Hunter's reliability, and reliance on his statements remains deficient.

In sum, Plaintiffs' claim of fraud in the Microvision transactions depends on only two facts: (1) Cree paid more than the then-current market price for its second stake in Microvision and (2) a former Microvision director of R&D, who typically was involved in all Microvision R&D projects, was excluded from the Cree project. The former director concludes that he was kept out of the project to conceal the companies' fraud. Plaintiffs, relying on the alleged exclusion of the former R&D director and Microvision's weak financial condition (of which they present no evidence, only a single employee's assertion), adopt this inference and urge the court to do so as well. While such an

---

[11] See footnote 1, supra.

inference is possible, it is but one among many possible inferences that may be drawn from the former director's exclusion, and the facts presented fall far short of permitting the strong inference required by both Rule 9 and the PSLRA. Faced with having to plead facts sufficient to allow a strong inference that Cree intentionally overpaid for its investments in Microvision and that the R&D contract was a sham, Plaintiffs have failed in both respects. Plaintiffs' claims related to Microvision must, therefore, be dismissed.

### iii. Spectrian/UltraRF

On December 29, 2000, Cree paid $100 million for Spectrian's UltraRF division. The purchase price, according to Plaintiffs, was grossly in excess of the value of UltraRF, and the overpayment was returned to Cree through a $2.4 million R&D contract and a $58 million purchase agreement made with Spectrian in conjunction with the acquisition. Plaintiffs contend that Cree never performed any R&D services for Spectrian, and that the purchase agreement, which required Spectrian to buy specified minimum amounts of UltraRF products from Cree each quarter during the two years following the acquisition, was a sham.

Plaintiffs again allege a round-trip transaction and must demonstrate fraud in both directions: intentional overpayment for UltraRF by Cree and sham R&D and equipment purchases by

17

Spectrian. The $100 million acquisition price represents a valuation of approximately five times the book value of UltraRF (the value of UltraRF's hard assets and accounts receivable), as evidenced by Cree's allocation of $81.6 million of the purchase price to goodwill. Cree ultimately wrote off virtually all of the goodwill associated with the acquisition when, in the first calendar quarter of 2002, it determined that UltraRF was of no ongoing value to the Company.

The allocation to goodwill and the write-off are the only two facts offered by the Plaintiffs to support their assertion that Cree fraudulently overpaid for UltraRF. The allocation to goodwill is itself not probative of anything, as GAAP requires an acquirer to allocate to goodwill any amount paid above the book value of the acquired entity. Similarly, the subsequent write-off was also mandated by GAAP. While the write-off suggests Cree greatly misjudged the value of UltraRF, it is not evidence of fraud in the acquisition. Plaintiffs do not allege that a purchase price of roughly five times book value was extraordinary in the relevant market at that time, nor do they offer any factual evidence demonstrating that the "asset value, dividends, earning prospects, [or] the nature of the [UltraRF] enterprise" were such that a purchase price of $100 million was fraudulent on its face. Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc., 967 F.2d 742, 749 (2d Cir. 1992).

18

Instead, the complaint offers the assertions of several sources that UltraRF was not worth $100 million. The first source relied upon by Plaintiffs is Eric Hunter. For the reasons discussed above, Eric Hunter is not a reliable source. The next source, a Cree technician cited as knowing that Cree overpaid for UltraRF, is not identified beyond his job title and no basis is offered for his knowledge of an overpayment. The same is true of the former assistant to Spectrian's president, who said that UltraRF was worth no more than $5-10 million. Nothing in Plaintiffs' complaint provides any indicia of reliability for either witness's testimony such as their participation in the transaction, familiarity with UltraRF's operations and prospects, or even financial expertise. Indeed, nothing in the complaint suggests that a person in these sources' positions would possess the information supplied, see ABC Arbitrage Plaintiffs Group, 291 F.3d at 352, nor are "the facts alleged . . . particularly detailed, numerous, plausible, or objectively verifiable." Kinder-Morgan, 340 F.3d at 1103. Finally, a former Spectrian vice president said that it was well known that UltraRF's products did not measure up to Motorola's competing products, and that Cree bought a company with "dim prospects." A Spectrian VP may well have known of weaknesses at UltraRF, but Plaintiffs offer no evidence that such knowledge was obtained by Cree and do not claim that this witness had any involvement with the Cree

19

transactions. Plaintiffs do allege that Cree employees knew that Cree overpaid for UltraRF, but, other than the insufficiently identified technician, the complaint offers only the blanket allegation that knowledge of the overpayment was widespread at Cree after the deal closed.

Thus, in regard to Plaintiffs' assertion of Cree's intentional overpayment for UltraRF, the only facts offered are the purchase price itself and the subsequent writeoff. The opinions of the various sources presented are, except for the former Spectrian Vice President, unsubstantiated by any factual allegations related to the value of UltraRF, and the former Vice President's assessment that UltraRF could not compete with Motorola does not demonstrate that Cree could not conceivably expect to extract value out of the acquisition to justify the $100 million purchase price. As events turned out, Cree did not come close to generating such value, but a failed investment is not evidence of a fraudulent overpayment. Plaintiffs fail to present facts that permit a strong inference of an intentional overpayment in the acquisition. This failure requires the dismissal of Plaintiffs' claims of fraud in the Spectrian/UltraRF transactions.

Having failed to plead an intentional overpayment in the acquisition of UltraRF, Plaintiffs' claims that excess funds received by Spectrian were returned to Cree through sham R&D and

20

purchase agreements necessarily fail. The pleadings in support of those claims are, in any case, of questionable sufficiency. Three former Spectrian employees each contend that Cree failed to meet development milestones or produce results in the R&D project. They all met with Cree executives to discuss these failures. Cree, when it eventually wrote off its losses related to the acquisition, stated, in its March 24, 2002, 10-Q, that the acquisition had failed largely because Cree had been unable to "release to production" goods it had expected to sell to Spectrian.

There is little question that Cree's R&D efforts on behalf of Spectrian proved fruitless. Significantly, however, no allegations of fraud surfaced until the present action, over a year after Cree announced the write-off of UltraRF. Plaintiffs, relying on one witness's vague statement that Cree never performed any "real" R&D and that the R&D project was "smoke and mirrors," now conclude that Cree simply performed no R&D at all. Because the above statement is the only evidence offered that hints at anything other than simple failure, and is inconsistent with the allegations of this same witness as well as that of two other Spectrian employees, each of whom met with Cree about the lack of success of the R&D program, Plaintiffs' claim that the R&D contract was a sham is less than compelling and is not

21

supported by facts permitting the requisite strong inference of fraud.

Plaintiffs' claims related to the purchase agreement are similarly flawed. The purchase agreement was reached in conjunction with Cree's acquisition of UltraRF[12] and was fully disclosed at that time in Cree's Form 8-K filed with the SEC on December 29, 2000. It required Spectrian to make certain minimum purchases from Cree, primarily of goods produced by UltraRF, during each of the eight quarters following the acquisition for a total commitment of $58 million. Failure by Spectrian to meet its minimum quarterly commitment would result in penalty payments to Cree for the shortfall. Thus, the testimony offered by Plaintiffs' sources that Spectrian bought excess Cree products that they could not use or sell, that were outdated, and that added to an already bloated inventory is not, of itself, indicative of fraud.

---

[12]Plaintiffs suggest the simultaneity of the deals indicates fraud. Cree counters that the UltraRF acquisition was contingent upon the purchase agreement because Spectrian had historically bought most, if not all, of UltraRF's output, and such an agreement was both reasonable and necessary to ensure the value of the acquisition in the short term while Cree attempted to expand the market for UltraRF products. Spectrian's form 10-K filed with the SEC on March 31, 2000, states that prior to November 1999 Spectrian's UltraRF Division sold its products almost exclusively to Spectrian's Amplifier Division, but that after November 1999 Spectrian would begin to operate UltraRF as an autonomous business unit and seek to expand its market.

22

One of Plaintiffs' sources, however, a former Spectrian materials manager, further asserts that Spectrian had a right under the agreement to reject shipments from Cree if the goods failed to meet specifications. In response, Cree produced the contract, which was publicly available through Spectrian's SEC filings. That contract shows that Spectrian's minimum purchase commitment was subject to an adjustment for "performance and component availability," the clause that Plaintiffs contend permitted Spectrian to reject Cree's non-conforming goods. Another source, a former Spectrian supply chain manager, stated that Spectrian management nevertheless ordered her to "execute the contract" despite knowing that the goods were "defective."

As an initial matter, Plaintiffs fail to establish the reliability of these sources insofar as the meaning of the contract provisions in question are concerned. The sources do not claim to have negotiated the contract, nor do they claim to be responsible for decisions interpreting the contract. Indeed, it is clear that the role of the latter source was to administer the purchases pursuant to orders from her superior. Thus, the value of these sources' testimony as to Spectrian's right to reject goods under the purchase agreement is slight.[13] Even

_____

[13]The performance and component availability adjustment cited by these sources is not as simple as Plaintiffs portray it. It provides that if Spectrian "locked in" a component to the design of a new Spectrian product, and Cree could not supply such a

(continued...)

23

assuming such a right existed and that the conditions for invoking it were present, it is doubtful that Spectrian's continued purchases would permit a strong inference of fraud. In the absence of any evidence of an intentional overpayment in the UltraRF acquisition the question is, however, moot, and Plaintiffs' claims related to Spectrian must be dismissed.

iv. C&C

Charles & Colvard, Ltd. ("C&C," formerly known as C3) manufactures artificial gemstones from silicon carbide crystals. The company was founded by Eric Hunter and his brother, Jeff Hunter, and was used, according to Plaintiffs, in a channel stuffing scheme in which Cree increased its revenue by forcing C&C to purchase crystals far in excess of its needs.

Plaintiffs' claim of fraud in Cree's relationship with C&C is based on statements made by Eric Hunter in his initial

---

[13](...continued)
component or develop one that performed competitively with that of another vendor within an agreed upon time, then, if there were no other Cree products Spectrian could buy to meet its minimum purchase requirement, the amount Spectrian paid to buy the competing "locked in" component would be counted towards its minimum purchase requirement. Thus, failure to meet Spectrian's specifications is only one condition precedent to invoking the adjustment clause. Spectrian could fail to meet its minimum purchase requirement without penalty only if the component that Cree failed to deliver to specification was one that was "locked in" to a product by Spectrian, and even then only if Cree had no other product in its entire lineup that Spectrian could purchase and use somewhere in its chain of production. Plaintiffs present no evidence that the conditions of the agreement were satisfied.

24

complaint.  In its August 27, 2004, opinion, this court directed Plaintiffs to substantiate Eric Hunter's basis for knowledge of the alleged scheme.  Plaintiffs have failed to do so and Eric Hunter remains an unreliable source.

Plaintiffs' primary remaining source is a former Cree process engineer who was involved in the daily operations of Cree's relationship with C&C.  This source claims that Cree's sales to C&C were made under a "secret" contract that dictated sales based on Cree's need for revenue rather than C&C's demand.  Thus, Cree's sales to C&C remained at a constant level over time rather than varying with demand, as was typical of other accounts, and Cree regularly shipped large quantities of crystals to C&C despite C&C's inability to sell them and despite its already bloated inventory.  A former C&C vice president of marketing, who also served on C&C's board of directors, added that C&C was "feeding Cree" by overpaying for inferior crystals and regularly writing checks for $200,000 to $300,000.

The questions of impropriety raised by these witnesses are largely answered by the fact that Cree's sales to C&C were made pursuant to a long-term output contract between the two companies.  In place since at least 1999, the contract was far from secret, as it was publicly disclosed by both Cree and C&C in their respective SEC filings.  It required Cree to dedicate certain crystal-growing equipment exclusively to C&C, and C&C

25

agreed to purchase the entire output produced by that equipment, paying a sliding fee depending on the quality of crystals produced. Thus, Cree's steady sales to C&C, C&C's acceptance of shipments that merely added to its already overstocked inventory, and C&C's regular payments to Cree are, in light of the fully disclosed output contract, indicative not of fraud but of the execution of the contract.

Plaintiffs further contend, however, that the output contract itself was fraudulent. They allege that "(i) Cree exerted actual control over C&C in all business dealings between the companies; (ii) when Cree needed income, it would cause C&C to pay Cree money in a transaction having no legitimate business purpose; [and] (iii) none of the agreements or transactions entered into between the companies were at arms length." (See, e.g., FAC ¶ 174). The only evidence offered by Plaintiffs in support of these allegations is that C&C was founded by Eric and Jeff Hunter, brothers of F. Neal Hunter, CEO of Cree during the putative class period, and that Cree and certain Cree officers owned shares of C&C. Cree, which owned 1.5% of C&C, sold its entire stake before the start of the class period, and the five individual Defendants who owned C&C stock held only 1.5% at the start of the class period. Plaintiffs present no evidence that C&C acted as a subsidiary or agent of Cree, that C&C's board of directors was controlled by Cree, or that the owners of the 98.5%

26

of C&C shares not held by the individual Defendants were somehow dominated by Cree. Without more, the small ownership stake held by the individual Defendants is insufficient to support Plaintiffs' assertion that Cree controlled C&C.

Plaintiffs also allege that Cree violated GAAP and concealed its fraudulent scheme by improperly accounting for goods shipped to C&C that were subject to an undisclosed right of return. Significantly, Plaintiffs identify no source who claims such a right of return existed. See FAC ¶ 84. Instead, they conflate Eric Hunter's and the process engineer's claims that the output contract was a secret with the process engineer's further testimony that, in the spring or summer of 2001, C&C rejected shipments from Cree and, rather than return them, stored the goods at its own warehouse. Without a source for their allegations of the undisclosed right of return, Plaintiffs' GAAP claim fails, as does their attempt to use the supposed right of return as substantive evidence indicating fraud in Cree's sales to C&C.

Plaintiffs offer two additional claims based on Eric Hunter's June 12, 2003, complaint. First, Plaintiffs repeat Eric Hunter's allegation that Cree's sale of equipment to C&C and the subsequent repurchase of that equipment was a sham transaction. Next, Plaintiffs allege that Cree failed to perform R&D for which C&C had paid $2.4 million. The purpose of each transaction,

27

according to Plaintiffs, was to facilitate Cree's ongoing efforts
to artificially inflate its stock price. Because Plaintiffs have
failed to cure the previously identified pleading deficiency
related to Eric Hunter's reliability, their allegations must be
dismissed.

B. <u>Loss Causation</u>

Under the PSLRA, Plaintiffs bear "the burden of proving that
the act or omission of the defendant alleged to violate this
title caused the loss for which the plaintiff seeks to recover
damages." 15 U.S.C. § 78u-4(b)(4). This provision "makes clear
Congress' intent to permit private securities fraud actions for
recovery where, but only where, plaintiffs adequately allege and
prove the traditional elements of causation and loss." <u>Dura
Pharms., Inc. v. Broudo</u>, _____ U.S. _____, 2005 U.S. LEXIS 3478,
*17 (2005). Plaintiffs complain that because of the alleged
misrepresentations related to the WTI, Xemod, Lighthouse,
Spectrian, Microvision, and C&C transactions, they were deceived
into purchasing Cree stock at artificially inflated prices and,
therefore, suffered losses.

"Normally, in cases such as this one (<u>i.e.</u>,
fraud-on-the-market cases), an inflated purchase price will not
itself constitute or proximately cause the relevant economic
loss." <u>Id</u>. at *11. This is so because

28

> [w]hen the purchaser subsequently resells such shares,
> even at a lower price, that lower price may reflect,
> not the earlier misrepresentation, but changed economic
> circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions,
> or other events, which taken separately or together
> account for some or all of that lower price.

<u>Id</u>. at *12.

Thus, because the statute, and the common law on which it is based, requires Plaintiffs to demonstrate that the misrepresentations were the proximate cause of their loss, they must show not only that the misstatements inflated the purchase price of Cree's stock, but also that the "alleged misrepresentations were a substantial cause of . . . its subsequent decline in value." <u>Miller v. Asensio & Co.</u>, 364 F.3d 223, 232 (4th Cir. 2004) (citing <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 186-87 (3d Cir. 2000)). More precisely, "a plaintiff must allege . . . that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, <u>i.e.</u>, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." <u>In re Initial Pub. Offering Sec. Litig.</u>, 2005 U.S. Dist. LEXIS 9318, *13 (S.D.N.Y. 2005) (internal quotations omitted) (describing the standard applied by the majority of United States Circuit Courts); <u>see Dura</u>, _____ U.S. at _____, 2005 U.S. LEXIS 3478 at *15 ("a person who misrepresents the financial condition of a corporation in order to sell its stock

becomes liable to a relying purchaser for the loss the purchaser sustains when the facts . . . become generally known and as a result share value depreciates") (citing Restatement (Second) of Torts § 548A cmt. b (1977) (internal quotations omitted)).

As noted, the supposedly fraudulent statements concealed from the market the "true" nature of Cree's transactions with WTI, Xemod, Lighthouse, Spectrian, Microvision, and C&C. Thus, for Plaintiffs to properly plead loss causation, they must show that a disclosure of fraud in those transactions occurred, and that upon such disclosure the price of Cree's stock dropped, resulting in Plaintiffs' economic loss. The loss for which Plaintiffs seek to recover occurred on June 13, 2003, when Cree's stock price dropped from $22.21 to $18.10, a slide of 18.5%. Plaintiffs identify the cause of this loss as "the [June 12, 2003] filing of Eric Hunter's lawsuit and its disclosure of the fraud [perpetrated by Cree]." (Pls.' Br. Opp'n Defs.' Mot. Summ. J. p. 30.)

It is indisputable that the filing of Eric Hunter's lawsuit precipitated the Plaintiffs complained-of loss. It is evident, however, that the lawsuit did not disclose anything about transactions with five of the six companies Plaintiffs now claim were the subjects of numerous misstatements and omissions. The only transactions identified in Eric Hunter's complaint are those between Cree and C&C. Cree's sales to C&C, according to the

30

complaint, were made pursuant to an "undisclosed and long-term requirements contract . . . which required C&C to accept shipments of silicon carbide crystals . . . far in excess of market demand, in order to artificially increase the operating income of Cree by forty percent or more."  Eric Hunter's complaint further alleges that Cree's repurchase of crystal-growing equipment from C&C was an effort to disguise the fraudulent sales of crystals to C&C.

As discussed above, these transactions were fully disclosed by Cree in various SEC filings at the time they were executed. Eric Hunter's complaint discloses nothing new, but merely attributes an improper purpose to the previously disclosed facts. In such a situation, where investors were, or should have been, aware of the transactions, the facts of which are not disclosed to be different than those which were previously disclosed by the Company, but the motives for entering into the transactions are cast in a negative light, it cannot be said that a new disclosure occurs such that a resulting loss in share price is caused by the transaction.  The loss is caused by the subsequent characterization of the transaction, and the transaction cannot be the proximate cause of the complained-of loss.  The filing of Eric Hunter's lawsuit is merely a subsequent event that caused such loss.

Eric Hunter's complaint is devoid of factual allegations related to any of the other transactions Plaintiffs allege to be fraudulent. Instead, it states only that Cree executives, including his brother, F. Neal Hunter, engaged in various attempts to harass, threaten, and intimidate him to prevent him from disclosing "a series of undisclosed corporate activities and other acts" perpetrated by Cree in violation of federal securities and employment laws.

It is doubtful that a general averment of fraud with no specific factual allegations could be deemed a "disclosure" for purposes of determining whether some act or omission, previously concealed by a false representation, caused, upon revelation, a shareholder's loss. While it is clear that a disclosure need not conform to any prescribed format, it must nevertheless satisfy at least a minimum standard of content. A disclosure must reveal new facts; a bald assertion of fraud is not sufficient. The meager pleading of fraud in Eric Hunter's complaint includes no factual allegations whatsoever related to any of the transactions of which Plaintiffs now complain. Any loss that followed his complaint was not, therefore, caused by the revelation of factual misstatements or omissions related to those transactions, but by the subsequent allegation of an ulterior motive for one of the previously disclosed transactions.

32

Plaintiffs have failed to demonstrate a direct relationship between their losses and the alleged misrepresentations and have failed, therefore, to establish the required element of loss causation.[14]

C.  <u>Scienter</u>

The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," that is, scienter.  15 U.S.C. § 78u-4(b)(2); <u>Phillips</u>, 190 F.3d at 613.  "In a securities fraud action, 'the term "scienter" refers to a mental state embracing intent to deceive, manipulate, or defraud.'"  <u>Ottmann v. Hanger Orthopedic Group, Inc.</u>, 353 F.3d 338, 343 (4th Cir. 2003)

---

[14]At oral argument on Defendants' motion to dismiss, Plaintiffs' counsel requested, in the event the court found the FAC deficient in pleading loss causation, permission to replead as to that element.  Counsel made this request in response to Defendants' reliance on the Supreme Court's decision in <u>Dura Pharms., Inc. v. Broudo</u>, _____ U.S. _____, 2005 U.S. LEXIS 3478 (2005), that pleading an inflated purchase price without more will not satisfy a plaintiff's burden of proof as to loss causation.  The Supreme Court's decision, however, set forth no new legal principles, nor did it effect a change in the Fourth Circuit's approach to loss causation.  <u>See</u>, <u>e</u>.<u>g</u>., <u>Miller v. Asensio & Co.</u>, 364 F.3d 223, 232 (4th Cir. 2004) (holding that a securities fraud plaintiff must "prove that defendant's misrepresentation was a substantial cause of the loss by showing '[a] direct or proximate relationship between the loss and the misrepresentation'" (quoting <u>Gasner v. Bd. of Supervisors</u>, 103 F.3d 351, 360 (4th Cir. 1996)).  Both cases, as well as numerous others, were published prior to Plaintiffs' filing of the FAC on October 26, 2004.  Furthermore, any attempt to replead would be futile for the reasons stated above.  Plaintiffs' request is, therefore, denied.

(quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976)).

"[S]cienter may also be established by a showing of

recklessness."[15]  Id.

A "flexible, case-specific analysis" guides the court in

determining the sufficiency of a plaintiff's scienter

allegations.  Id. at 345.  Nevertheless, the complaint must

contain "a substantial factual basis in order to create a strong

inference that the defendant acted with [scienter]."  Phillips,

190 F.3d at 621.  Furthermore, Plaintiffs must plead facts

"specific to each individual defendant" showing that he or she

acted with scienter in making the alleged misrepresentations.  In

re Royal Ahold N.V. Sec. & ERISA Litig., 351 F. Supp. 2d 334, 369

(D. Md. 2004) (citing Ottmann, 353 F.3d at 345-46).  A source's

title or position is not a sufficient basis from which to infer a

defendant's state of mind, see In re Cree, 333 F. Supp. 2d at 475

and cases cited therein, but in some cases "it may be inferred

that facts critical to a business's core operations or an

important transaction are known to a company's responsible

officers."  In re Northpoint Commnns. Group, Inc., Secs. Litig. &

Consol. Cases, 221 F. Supp. 2d 1090, 1104 (N.D. Cal. 2002).  A

---

[15]The Fourth Circuit defines recklessness as "an act 'so
highly unreasonable and such an extreme departure from the
standard of ordinary care as to present a danger of misleading
the plaintiff to the extent that the danger was either known to
the defendant or so obvious that the defendant must have been
aware of it.'"  Phillips, 190 F.3d at 621 (quoting Hoffman v.
Estabrook & Co., 587 F.2d 509, 517 (1st Cir. 1978)).

34

complaint that fails to comply with the heightened pleading requirements of the PSLRA must be dismissed. <u>See</u> 15 U.S.C. § 78u-4(b)(3)(A).

Plaintiffs first offer a number of arguments demonstrating, directly or indirectly, the individual Defendants' knowledge of the allegedly fraudulent transactions. Relying on Eric Hunter and other sources, Plaintiffs contend that F. Neal Hunter participated in the negotiation of the Microvision, Spectrian, and C&C transactions, and that Swoboda and Merrell also negotiated the purchase of UltraRF from Spectrian. The complaint also includes numerous references to the participation of "Cree executives" and the "top brass" in the various transactions. Plaintiffs further argue that the individual Defendants knew or should have known of the ongoing fraud based on the materiality of the transactions, in terms of the number of transactions, the amounts of revenue involved, and the likelihood that Cree would have failed to meet analyst expectations without that revenue; that the Defendants' positions within the Company indicate they had knowledge of the transactions; and that Company policies that dictated the Defendants' roles in the transactions create a presumption of knowledge of any ongoing fraud.

Where Plaintiffs rely solely on Eric Hunter, their scienter allegations remain deficient. Similarly, broad references to the involvement of unnamed Cree executives in the various

35

transactions cannot support a strong inference of fraud.
Assuming, without deciding, that the materiality of the
transactions, the positions held by the individual Defendants,
and Cree's corporate policies are proper bases on which to
establish scienter, some inference may be made that Defendants
Hunter, Merrell, Swoboda, and, perhaps, Palmour had knowledge of
the "true" nature of the allegedly fraudulent transactions. Such
knowledge would be sufficient to support the inference that the
Defendants knew of, or were reckless in failing to know of, any
false statements related to the transactions. The inference is
considerably weaker as applied to the non-officer Defendants
Carter, Dykes, von Arx, and Robb. Having failed to adequately
plead fraud in the transactions, however, Plaintiffs have failed
to establish the falsity of the identified statements. There is,
therefore, no act or omission attributable to the Defendants such
that they may be said to have acted with intent to defraud. This
renders the scienter inquiry moot.

Plaintiffs also rely on Cree's alleged GAAP violations to
support their scienter pleadings and contend that the individual
Defendants' sales of Cree stock during the class period were of
an unusual pattern and volume that suggests fraud. GAAP
violations, standing alone, are insufficient to support a strong
inference that Defendants acted with scienter, but may support
such an inference when combined with other evidence of fraudulent

36

intent.  See In re Cree, 333 F. Supp. 2d at 477 (citing Novak v. Kasaks, 216 F.3d 304, 309 (2d Cir. 2000)).  Having failed to plead fraud in the C&C, Microvision, and Spectrian transactions, Plaintiffs have failed to establish GAAP violations in Cree's reporting of those transactions.  Accepting as true for purposes of this motion to dismiss Plaintiffs' claims that Cree violated GAAP in failing to report the WTI, Xemod, and Lighthouse transactions in a timely manner, the absence of any other indicia of fraudulent intent precludes a finding of scienter based on those violations.  Finally, because Plaintiffs have failed to demonstrate fraud in any of the identified transactions, further consideration of the individual Defendants' sales of Cree stock is moot.  Nevertheless, it is doubtful that Plaintiffs have demonstrated that any of the individual Defendants' stock sales were sufficiently unusual in timing or amount, or were otherwise suspicious, to permit a strong inference of fraudulent intent.[16]

## II.  Section 20(a) and Section 20(A) Claims

Counts II and III of the complaint allege violations of Section 20(a) and Section 20(A) of the Exchange Act.  Section 20(a) imposes liability on "every person who, directly or

_____

[16]At oral argument of Defendants' motion to dismiss the FAC, Plaintiffs' counsel said that he was "not sure" of the significance of the stock sales other than they were "substantial."  (Tr. p. 49, May 31, 2005, Oral Argument on Motion to Dismiss.)

indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" unless the controlling person acted in good faith and did not induce the violation. 15 U.S.C. § 78t(a). Section 20(A) allows a private right of action for purchasers and sellers of securities who trade contemporaneously with an insider possessing material nonpublic information. See 15 U.S.C. § 78t-1(a). To state a claim pursuant to Section 20(a) or Section 20(A), Plaintiffs must plead a predicate violation of the Exchange Act. See In re E.spire Communs., Inc. Sec. Litig., 127 F. Supp. 2d 734, 750 (D. Md. 2001) (dismissing plaintiff's Section 20(a) claim for failure to allege a "primary violation" of Section 10(b) and Rule 10b-5); In re MicroStrategy Inc. Secs. Litig., 115 F. Supp. 2d 620, 662 (E.D. Va. 2000) (acknowledging that a predicate violation is needed to state a Section 20(A) claim). Because Plaintiffs have not stated a claim for securities fraud under Section 10(b) and Rule 10b-5, their Section 20(a) and Section 20(A) claims must be dismissed.


III.  <u>Section 18 and Sarbanes-Oxley Act Claims</u>

Plaintiffs also bring claims pursuant to Section 18 of the Exchange Act and Section 304 of the Sarbanes-Oxley Act of 2002. Under Section 18, a person who makes a materially false or misleading statement in a document filed with the SEC is liable

38

for damages to any person who relied on the misstatement in purchasing or selling a security at a price affected by the misstatement. 15 U.S.C. § 78r(a). Because Plaintiffs have not demonstrated the falsity of any statement issued by Cree or the individual Defendants, their Section 18 claim must be dismissed.

Section 304 of the Sarbanes-Oxley Act of 2002 provides for the forfeiture of bonuses and profits by certain corporate officers if the corporation "is required to prepare an accounting restatement due to the material noncompliance of the issuer, as a result of misconduct, with any financial reporting requirement under the securities laws." 15 U.S.C. § 7243. Certain provisions of the Sarbanes-Oxley Act include an express private right of action; Section 304 does not. Although the court is doubtful of the existence of a private right to sue under Section 304, it need not resolve the issue now. The plain language of the provision precludes its application to any individual Defendant in this case. First, Plaintiffs have failed to allege or demonstrate that Cree was required to issue a restatement of its financial reports. Instead, they refer to Cree's discussion of its investments in WTI, Xemod, and Lighthouse in the September 25, 2003, 10-K, which was filed several months after Eric Hunter's complaint and the resulting class action complaints. This discussion is likely not a restatement at all, but in any case the Company was not required

39

by any authority to issue it. Similarly, as Plaintiffs have
failed to demonstrate fraud in any of the identified
transactions, any statement or restatement issued by Cree cannot
be said to have been prepared as the result of noncompliance
resulting from misconduct. Plaintiffs' Section 304 claims must,
therefore, be dismissed.


CONCLUSION


    Plaintiffs' amended complaint fails to state with
particularity facts supporting their allegations of fraud in the
WTI, Xemod, Lighthouse, Microvision, Spectrian, and C&C
transactions; fails to plead with particularity facts giving rise
to a strong inference that Defendants acted with scienter in
making any misrepresentations related to those transactions; and
fails to adequately plead loss causation. Plaintiffs'
Section 10(b) and Rule 10b-5 claims will, therefore, be
dismissed. Plaintiffs' Section 20(a) and Section 20(A) claims
will be dismissed for failure to state a predicate violation of
the Exchange Act, and Plaintiffs' Section 18 claim will be
dismissed for failure to demonstrate the falsity of any statement
issued by the Defendants. Finally, Plaintiffs' Sarbanes-Oxley
claim will be dismissed for failure to demonstrate that the

Defendants were required to issue a restatement of any financial reports as a result of misconduct.

Plaintiffs' complaint will be dismissed in its entirety with prejudice. An order and judgment in accordance with this memorandum opinion shall be entered contemporaneously herewith.

_____
United States District Judge

August 2, 2005

41